Law Offices of
Kenneth M. Stillman, P.C.
Kenneth M. Stillman, Esq.
Texas State Bar #19240500
3514 Cedar Springs Road
Dallas, Texas    75219
(214) 522-0632

Attorneys for Plaintiffs

```
U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
        FILED
      MAR  3 2006
CLERK, U.S. DISTRICT COURT
By_____
           Deputy
```

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

228517

| | | |
|---|---|---|
| COVENANT CAPITAL PARTNERS & | § | |
| COVENANT CAPITAL PARTNERS II, | § | |
| both General Partnerships | § | |
| formed pursuant to the | § | |
| provisions of the Tennessee | § | |
| Revised Uniform Partnership | § | |
| Act and the laws of the | § | |
| State of Tennessee | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. **3-06 CV - 0 3 9 9 N** |
| | § | |
| | § | |
| | § | PLAINTIFFS' ORIGINAL COMPLAINT |
| | § | AND REQUEST FOR JURY TRIAL |
| | § | |
| SOIL SAVERS, INC. ("SSI"), | § | |
| a Texas corporation; Larry | § | |
| T. Johnson, an individual | § | |
| and as director and officer | § | |
| of SSI; William ("Bill") W. | § | |
| Rippetoe, an individual and | § | |
| as director and officer of | § | |
| SSI; Robert G. Bishop, an | § | |
| individual and as director | § | |
| and officer of SSI; | § | |
| and, DOES 1-7, inclusive. | § | |
| | § | |
| Defendants | § | |

## *PLAINTIFFS' ORIGINAL COMPLAINT*
## *AND REQUEST FOR JURY TRIAL*

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, COVENANT CAPITAL PARTNERS AND COVENANT CAPITAL PARTNERS II (hereinafter collectively called "Plaintiffs", in the above-entitled and numbered cause, complaining of SOIL SAVERS, INC. (hereinafter called "SSI"), LARRY T. JOHNSON, WILLIAM (BILL) W. RIPPETOE, AND ROBERT G. BISHOP (hereinafter collectively called "Defendants"), and files this their Original Complaint and Request for Jury Trial in the above-entitled and numbered cause, and for cause of action would respectfully show the Court the following:

I.

Plaintiffs Covenant Capital Partners ("Covenant") and Covenant Capital Partners II ("Covenant II"), both General Partnerships formed pursuant to the provisions of the Tennessee Revised Uniform Partnership Act and the laws of the State of Tennessee, by and through the Co-Managing Partner of both Covenant and Covenant II, Michael A. Parsons, referred to collectively as "Plaintiffs", all of whom allege and state as follows:

II.

## **NATURE OF THE ACTION**

1.    This is an action for securities fraud and related claims for violation of the Texas Securities Act, originating

out of the unlawful conduct and activities of Defendants Soil Savers, Inc., Larry T. Johnson ("Johnson"), William W. Rippetoe ("Rippetoe"), Robert G. Bishop ('Bishop") and DOES 1-7. This action against the aforementioned Defendants arises out of a securities fraud orchestrated by Johnson, Rippetoe and Bishop, which is believed, based upon presently available information, to have raised aggregate sums in excess of Eleven Million Dollars ($11,000,000) from the public. In particular the two (2) plaintiff partnerships were organized solely for the purpose of obtaining funds from members of said partnerships to purchase Soil Savers stock (and the attendant royalty rights) from Johnson.

Plaintiffs invested a total of over Two Million Five Hundred Thousand Dollars ($2,500,000) in what they now realize was an investment scheme of the Defendants. Johnson, upon receipt of these funds from Plaintiffs, is believed upon information and belief of Plaintiffs, to have distributed a "share" of said funds to Rippetoe and Bishop.

2. The said securities fraud and investment scheme involved the sale of shares in Soil Savers, Inc., a Texas corporation. These individual Defendants worked together and sold shares in SSI which were personally held in the name of Johnson. In order to so market these shares of stock, the individual Defendants Johnson, Rippetoe, Bishop and DOES 1-7,

promised that said purchase of stock would provide a return on their investment within a relatively short period of time, plus payment of royalties for each ton of soil treated by Soil Savers. These Defendants, utilizing false financial records, exaggerated sales figures, fraudulent projections of current and future company projects; grossly misrepresented the true market value of said stock and the existence of and value of SSI assets and intellectual property to potential investors, including the Plaintiffs. The said Defendants further exaggerated the experience and expertise of Defendant Rippetoe regarding his alleged ability to successfully and economically remediate soil.

Furthermore, Johnson, Rippetoe and Bishop failed to disclose to prospective investors, including the Plaintiffs, that Johnson and Rippetoe would retain for their personal use and enjoyment excessive amounts of the money raised by virtue of the subject scheme; and, that Johnson would also pay to Bishop an exorbitant fee for his funding raising activities, even though Bishop was not legally entitled to compensation for the sale of said securities. In addition, Defendants did not pay the aforementioned royalties as promised, but instead Johnson, Rippetoe and Bishop caused large payments of cash to be made to themselves. Plaintiffs are informed and believe that almost all the money invested by Plaintiffs was immediately paid over to RTJ Enterprises (a company wholly owned by Johnson and/or

immediate family members of Johnson).

3.    After raising the investment capital referenced above from Plaintiffs, Johnson, supposedly on behalf of Soil Savers; and, without the knowledge or approval of Plaintiffs, entered into a purported Licensing and Sale Agreement with Zoom, whereby the patents allegedly owned by SSI regarding its proprietary method for decontaminating soil, were licensed to Zoom Developers USA, LLC ("Zoom"), for a very nominal fee, far less than reasonable in relation to the representations as to company value previously communicated to Plaintiffs.

Thereafter, Johnson, without consulting shareholders, ceased operations through SSI, instead directing work through a Zoom entity, SOIL SAVERS, LLC and a separate entity, SSI Holdings, Inc. In exchange, Johnson and Rippetoe received a very generous salary and excessive compensation from Zoom, all unknown and not disclosed to Plaintiffs. In addition, Johnson has caused payments made by Zoom to the Soil Savers entities to be transferred to RTS Enterprises and himself and Rippetoe.

4.    Defendants' conduct has caused and continues to cause Plaintiffs' serious, significant and irreparable damage and harm.

III.

## JURISDICTION AND VENUE

5.    This Court has original jurisdiction over this action pursuant to the Securities Exchange Act of 1934 ("Exchange Act") 15 U.S.C. §78.J(b) and SEC Rule 1O(b-5) at 17 CFR 240.10 (b-5).

6.    This Court has supplemental jurisdiction over the related counts 2, 3, 4, 5, 6, and 7, because these claims are so related to the above Federal claims that they form a part of the same case or controversy and under 28 U.S.C. 1367(a). There is also supplemental jurisdiction under 28 U.S.C. 1332.

7.    This court has supplemental jurisdiction over the related counts 4 and 5 in that these claims are so related to the above Federal claims that they form a part of the same case or controversy.

8.    This court has personal jurisdiction over Defendants in that Defendants were doing business in the State of Texas and in this District. In addition, almost all of the acts of fraud and misrepresentation complained of herein occurred in the State of Texas and in this District.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 (a)(2) and (b)(2).

IV.

## **AVERMENTS COMMON TO ALL COUNTS**

## **THE PARTIES**

10. Plaintiff Covenant Capital Partners is, and at all times relevant was, a General Partnership formed pursuant to the provisions of the Tennessee Revised Uniform Partnership Act and the laws of the State of Tennessee.

11. Plaintiff Covenant Capital Partners II is, and at all times relevant was, General Partnership formed pursuant to the provisions of the Tennessee Revised Uniform Partnership Act and the laws of the State of Tennessee.  As aforementioned, the two (2) plaintiff partnerships were organized solely for the purpose of obtaining funds from members of said partnerships to purchase Soil Savers stock (and the attendant royalty rights) from Johnson.

12. Plaintiffs are informed and believe, and thereon on that basis allege, that defendant Soil Savers, Inc. is a corporation organized and existing under and by virtue of the laws of the State of Texas, with its principal place of business presently located in the City of Southmayd, County of Grayson, State of Texas, which business location is within the jurisdictional boundaries of this judicial district.

13a. Plaintiffs are informed and believe, and thereon on that basis allege, that Defendant Larry T. Johnson is and at all times relevant herein was, a citizen and resident of the City of Frisco, County of Collin, State of Texas, which residential location is within the jurisdictional boundaries of this judicial district. Johnson is also the president and director of Soil Savers, Inc., a Texas corporation and so served said corporation at all times relevant herein.

13b. Plaintiffs are informed and believe, and thereon on that basis allege, that Defendant William W. Rippetoe is and at all times relevant herein was, a citizen and resident of the City of Dallas, County of Dallas, State of Texas, which residential location is within the jurisdictional boundaries of this judicial district. Rippetoe was also an officer and director of Soil Savers, Inc., a Texas corporation and so served said corporation at all times relevant herein.

14. Plaintiffs are informed and believe, and thereon on that basis allege, that defendant Robert G. Bishop is and at all times relevant herein was, a citizen and resident of the City of Tijeras, County of Bernalillo, State of New Mexico. Bishop was also an officer and director of Soil Savers, Inc., a Texas corporation and so served said corporation at all times relevant herein.

15. The true names and capacities, whether individual,

corporate, associate, or otherwise, of all Defendants sued herein as DOES I through 7 are unknown to Plaintiffs because defendant Johnson created a complex scheme of corporations and limited liability companies in various states, including Texas, Oklahoma, Florida, New York and California.

Because of the complex nature of Defendants' fraudulent schemes and their overt attempts to conceal their wrongdoing, there are Defendants, including maybe individuals and also perhaps business entities, that might have been illegally involved in and unlawfully participating in Defendants' fraudulent scheme; and, should be included as Defendants. Accordingly, Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs will seek leave of Court to amend their Complaint to state DOES 1-7 true names and capacities when the same have been ascertained. Plaintiffs are informed and believe and on that basis aver that said Defendants are liable to Plaintiffs as a result of their participation in all or some of the unlawful acts hereinafter set forth.

V.

## **GENERAL ALLEGATIONS**

16. This matter involves a nationwide network of corporations and limited liability companies utilized by Johnson, Rippetoe and Bishop to raise sums of money believed to

be in excess of Eleven Million Dollars ($11,000,000), by means of several similar fraudulent schemes.

17.    In all of these schemes, Johnson, Rippetoe and Bishop, directly and indirectly, represented to prospective investors that the various corporations they formed owned the rights to revolutionary proprietary technology, including issued patents and pending patents. Additionally, Johnson and Bishop, misrepresented the value, assets and work-in-progress of the various corporations, while Rippetoe misrepresented the previous use and utility of the subject "scientific" technology.

18.    Using this alleged proprietary technology as the 'bait" for potential investors, Johnson formed various corporations for the alleged purpose of offering this technology to the public.   Bishop located potential investors to invest in these various entities.   To persuade investors to purchase stock in these various corporations, Johnson, Rippetoe and Bishop made false representations regarding the alleged proprietary technology of Soil Savers and the value thereof.

19.    Johnson and Bishop "teamed up" together to produce false promotional materials to present to potential investors, including these Plaintiffs.   In meeting with individual investors, Johnson and Bishop touted Soil Savers' proprietary information and patents and the value thereof.

In fact, Soil Savers has never been issued any patents

by the U.S. Patent and Trademark Office ("USPTO") and the value of said technology in the marketplace is questionable, to say the very least.   To inflate the purported value of the subject "scientific" technology, Rippetoe misrepresented the previous use and economic viability of the technology.

20.   Additionally, as part of the scheme, Johnson and Bishop grossly misrepresented the financial condition of Soil Savers.   Soil Savers was required to pay royalties and distribute royalty fee statements on a monthly basis to the Plaintiffs. Even these simple tasks have not taken place. For the most part, royalties were not paid whatsoever, and if ever paid, they were not timely remitted and were for a minimal amount for the sole purpose of either enticing investors to make further investments in Soil Savers, or to lure additional investors into the subject scam created by these Defendants.

21.   Furthermore, Johnson, Rippetoe and Bishop also utilized other schemes to entice potential investors to purchase stock in Soil Savers, including the Plaintiffs. These schemes involved misrepresenting not only the alleged revolutionary and proprietary technology owned and controlled by Soil Savers, but also misrepresenting Soil Savers' financial situation.

For example, the Defendants participated in issuing false financial records, including false financial statements and false balance sheets; and, the Defendants Rippetoe, Johnson

and Bishop participated in misrepresenting past, current and future soil remediation projects of Soil Savers and Rippetoe.

22. Soil Savers, through representations by Johnson and Bishop, continually asserted and stated to Plaintiffs and agents of Plaintiffs that Soil Savers was a growing, viable, on-going business, owning a majority of the stock in various companies with estimated total value of said stock of Sixty-eight Million Dollars ($68,000,000). Soil Savers made this representation via a Memo from Larry Johnson to "Parties of Interest" dated April 8, 2003 (subject "Limited stock of Soil Savers, Inc."), and specifically represented that Soil Savers, Inc. owns the majority of the following companies: Fuel Fx Inc. has an estimated value of $25,000,000, with SSI owning 68% of the 25,000,000 issued shares; that Fuel Fx International, Inc. has an estimated value of over $25,000,000, with Soil Savers owning 70% of the 25,000,000 issued shares; Soil Savers of Florida, Inc. has a current value of $5,000,000 (which value was represented to dramatically increase upon funding of the targeted fixed base operations in the region), with SSI owning 100% of the 25,000,000 shares issued; Soil Savers of New York, Inc. was represented to have a value of $8,000,000, with Soil Savers owning 100% of the 25,000,000 issued shares; and FX Technologies, Inc. alleged by Johnson to have an estimated value of $8,000,000, and Soil Savers owning 100% of the issued shares.

A true and correct copy of the April 8, 2003 Memo is attached hereto as Exhibit "A" and incorporated herein by this reference, the same as if incorporated herein word for word.

23.    In the aforementioned Memo of April 8, 2003, which was either prepared by all the Defendants or which the contents thereof was at least known by the Defendants other than Johnson, it is represented that Soil Savers has 25,000,000 shares authorized and issued and that Soil Savers is the holder of approximately 18 provisional patents with the said intellectual property valued at $50,000,000, and additional "value not currently carried on books" of $118,000,000. These statements and representations have now been shown to be false and misleading.    Johnson continues this Memo by stating several other significant and substantial advances of the company and further alleged that this stock offering set forth in the subject Memo would likely be the last time any SSI parent company stock will be available.

24.    Johnson concluded this Memo by stating that "(t)here is a very limited window of opportunity to purchase up to 10% or 2,500,000 shares of this parent company stock. . . .(t)his stock at this price is undervalued and will be available for a very short period of time only."    Further, the Memo points out that it was felt that the current investors might have the desire to acquire the stock which was tied to everything SSI is involved

in and that any interested investors with questions about this private sale of stock should contact Mr. Johnson directly or indicate their investment interest "to the appropriate parties".

25.   In addition, Soil Savers represented that it was operating at a profit at all times prior to the stock purchases by Plaintiffs. This, as well, turned out to be a materially false assertion by Defendants. In approximately September 2004, Johnson, for the first time, disclosed that Soil Savers, Inc. had lost $2 million the past two (2) years. This financial information was never disclosed to any of the Plaintiffs during the time they were investing in Soil Savers. To the contrary, Soil Savers, Inc., Johnson and Bishop all made both verbal representations and sent Updates and memos to Plaintiffs and representatives of Plaintiffs that Soil Savers, Inc. had many projects which would generate millions of dollars for SSI, thereby resulting in large royalty payments to Plaintiffs.

26.   Soil Savers, by and through its officers and directors Johnson, Rippetoe and Bishop, made these representations to investors from at least January of 2003 through May of 2004 with the intent of persuading these investors (i.e., Plaintiffs) to invest millions of dollars in Soil Savers. These Plaintiffs purchased Soil Savers stock from Larry T. Johnson based upon the representations of Johnson, Rippetoe and Bishop that Soil Savers had extensive past experience in successfully completing various

and numerous soil remediation jobs, had current contracts for soil remediation projects; and, were authorized and approved for many future contracts on soil remediation projects. Additionally it was represented by Defendants that the money invested in SSI by the Plaintiffs would be used by Soil Savers and its management to build up its infrastructure, including fixed site facilities so that Soil Savers could grow its market share, thereby resulting in increased royalty payments to the said investors.

27. These representations, as well as many other representations, were false and at the time the representations were made by Soil Savers, its officers and directors, including Johnson and Bishop, knew them to be false. Money invested by investors was not used by Soil Savers for business purposes, including site expansion, working capital, developing new contracts and funding projects. Instead, Johnson and Bishop had a scheme whereby the money invested by investors was run through Soil Savers and paid to themselves and others personally. These payments in no way represented what could properly and lawfully be considered legitimate compensation to the individuals for their services, but rather represented the officers and directors of Soil Savers using the corporation and its assets to personally enrich themselves to the detriment of the investors, including Plaintiffs.

28. As the scheme started to unwind and investors (including Plaintiffs) did not recover royalties as promised by Defendants, Johnson as chairman and chief executive officer of Soil Savers entered into a Licensing Agreement with Zoom furthering his and Rippetoe's personal gain from Soil Savers' alleged intellectual property. Soil Savers agreed to transfer its intellectual property and assets, such as they were, to Zoom and formed a holding company for the said alleged intellectual property assets, i.e., SSI Holdings, Inc., which is a Texas corporation formed on May 24, 2004 (only twenty days after stock was issued to Covenant II). As a result these Plaintiffs were deprived of the assets, if any, which formed the basis of their investment in Soil Savers. This transfer was without the benefit of notice or consent by shareholders (to the knowledge of Plaintiffs), as these Plaintiffs have never been notified of any shareholders meeting. On or about December, 2004, Johnson sent notice to the employees of Soil Savers that he was shutting down the operation of the company. Johnson, Rippetoe and Bishop (based on information and belief of the Plaintiffs) formed SOIL SAVERS of FLORIDA, LLC, a Florida limited liability company, on December 1, 2004. However, it is now believed that Johnson, Rippetoe and Bishop are now both promoting and operating various other enterprises in the environmental industry, all of which activity is contrary to the best interests of the Soil Savers'

investors and Plaintiffs in particular.

VI.

## COVENANT CAPITAL PARTNERS TRANSACTION

29. Based upon the above-referenced representations, the same incorporated herein again for reference in this paragraph, Covenant Capital Partners, a general partnership consisting of thirty-two investors in Soil Savers, Inc., entered into various written agreements to acquire Soil Savers stock and royalties in Soil Savers from defendant Larry T. Johnson, based upon an aggregate investment of $1,556,000 paid to Mr. Johnson. The negotiations for this transaction took place from April 8, 2003 to August 26, 2003. Note that on July 29, 2003, Johnson and Soil Savers entered into an Investment Agreement.

A true and correct copy of the said Investment Agreement is attached as Exhibit "B" and incorporated herein by reference. Note that each individual investor in COVENANT, also entered into separate Subscription Agreements with Larry T. Johnson. For the sum of $1,556,000, Covenant was to receive 972,500 shares of stock in SSI and also a royalty of $0.7775 Cents U.S. per ton on soil treated by SSI worldwide for the life of the Company and patents.

30. As part of the scheme to induce investment in Soil Savers, Johnson drafted a Memo touting Soil Savers, Inc. This Memo is dated April 8, 2003 and is a Memo from Larry Johnson to

"Parties of Interest" Re: Limited Stock of Soil Savers, Inc.  A true and correct copy of the April 8, 2003 Memo is attached hereto as Exhibit "A" and incorporated by reference as aforementioned and provided.  On or about April 8, 2003 Johnson transmitted the April 8, 2003 Memo to both of the individuals that became the two Co-Managing Partners of COVENANT when same became a legally formed partnership on April 22, 2003, for the purpose of providing information to induce COVENANT to pay Johnson money to invest in Soil Savers.

     31.   In the April 8, 2003 Memo, JOHNSON makes the following representations, among others, to-wit:

        SOILSAVERS is the holder of approximately 15 provisional patents that are currently being used by SOIL SAVERS and its affiliated companies SOIL SAVERS owns the majority of: FUEL FX, Inc. (domestic), Fuel FX International, Inc., SOIL SAVERS of Florida, Inc., SOILSAVERS of New York, Inc., FX Technologies, Inc. (water division).

•    SOIL SAVERS has licensed various technologies to those companies for use.

•    SOIL SAVERS licensed SOIL SAVERS technologies to a "substantial" company in Norway for a $400,000 up front fee and a technology transfer fee of $5 per ton and the projects included the Oslo Airport.

•    SOIL SAVERS entered into an alliance consisting of a large Kuwaiti company and a large engineering company in the U.S. to pursue the cleanup of Kuwait after the current war. Estimates of cleanup are in the 30 to 36 billion dollar range.

•    SOIL SAVERS was chosen by the United Nations to complete a feasibility study prior to the start of the war and that the current route with the alliance is much more beneficial than working with the U.N.

*COMPLAINT – Page 18 of 41*
*\c:\docs\2588.01\comp-doc.\*

•    SOIL SAVERS OF FLORIDA, INC. was beginning the process of establishing a fixed base operational facility expected to be completed by fiscal year 2003.

•    SOIL SAVERS of New York had $12 million in projects for the next 12-18 months, and a fixed base targeted for the market 2003-2004.

FX TECHNOLOGIES, INC. has been awarded a contract to clean up Lake Reseija outside of Los Angeles, and that this is of particular concern due to the fact that FX TECHNOLOGIES has been sole-sourced on the project and the project will utilize the FX Tri-Cycthnic Separator.

FUEL FX, INC. (North America market) is making stow but steady progress in the domestic market and has engaged a marketing firm to enhance its domestic sales. FUEL FX International, Inc. is making rapid and good progress in foreign countries, that Tunisia placed an order of 1,250 units which was sold out within 2 weeks, that the Tunisians are now developing efforts in Morocco, Malta, Algeria, Egypt and Jordan, and they expect increased sales from this region, and that Spain and Brazil are currently testing the technology as is China, in preparing for its first purchase order. SOIL SAVERS is negotiating with some large New York institutional funding sources who have expressed a deep desire to facilitate the capitalization of fixed soil remediation bases nationwide and that these individuals have strong government contacts which will be accessed for additional market share utilizing the patented Soil Savers process.

These investors have access to extremely large capital sources which will enable SOIL SAVERS to gain substantial market share and national recognition and that it is the desire of these firms to capitalize and grow the parent and its affiliates over the next few years in order to build value for a consolidation and potential public offering. There is a limited window of opportunity to purchase up to 10% or 2,500,000 shares of this parent company, SOIL SAVERS for $1.10 per share and that any purchases over $250,000 will be exercised for a $1 per share and that the stock at

this price will be available for a very short time.

32.  Johnson concludes the Memo by stating that "(t)here is a very limited window of opportunity to purchase up to 10% or 2,500,000 shares of this parent company stock (SSI) for $1.60 per share.  This stock at this price is undervalued and will be available for a very short period of time only."  Lastly, the last two (2) sentences of this Memo provide that the necessary agreements were attached and that any questions need to be addressed directly to Larry Johnson.

33.  Covenant, relying upon the above-referenced representations and many other representations from Johnson, Rippetoe and Bishop, became convinced that Soil Savers was an established soil remediation company with ongoing projects and future projects ensuring future growth, entered into an Investment Agreements and Subscription Agreements with Johnson as aforementioned and under terms and provisions as set forth in said documents.

34.  Soil Savers, Johnson, Rippetoe and Bishop continued to make false representations to COVENANT in furtherance of their scheme to defraud investors of their investments and continue to deceive investors that Soil Savers was utilizing the investment capital to increase market share, secure remediation contracts and thereby generate royalties for investors.

35. At no time did SOIL SAVERS, JOHNSON, Rippetoe or BISHOP represent to COVENANT that SOIL SAVERS would or did transfer its intellectual property assets to ZOOM, and as a result, the investors in SOIL SAVERS would receive nothing for their investment, but that both Messrs. Johnson and Rippetoe would profit handsomely from said transaction with ZOOM, all to the detriment of plaintiff and all other Soil Savers' investors.

36. On September 21, 2004, SOIL SAVERS issued a Press Release announcing that it concluded a worldwide license of soil remediation technology with Soil Savers, LLC, a wholly owned subsidiary of Zoom Developers U.S.A., LLC ("ZOOM"), to license its soil remediation technology. The Press Release states that Soil Savers, LLC intends to utilize newly acquired technology on a worldwide basis. The Press Release goes on to state that Soil Savers, LLC has the financial capability to enable the use of the technology on large projects, which have been developed by SOIL SAVERS, but require bonding and financial capabilities well beyond SOIL SAVERS' abilities.

VII.

## COVENANT CAPITAL PARTNERS II TRANSACTION

37. The Co-Managing Partners of Covenant continued to be a target of the SOIL SAVERS fraudulent securities scheme. Due to their past relationships with potential investors, the Co-Managing Partners of Covenant, Michael A. Parsons and Richard

Waters, JOHNSON, RIPPETOE and BISHOP continued from the Summer of 2003 through the Spring of 2004 to blatantly misrepresent the SOIL SAVERS' assets, income and "revolutionary patented technology". JOHNSON, RIPPETOE and BISHOP had schemed against COVENANT between the Spring of 2003 and August of 2003.

Between January to May of 2004 JOHNSON and BISHOP targeted COVENANT I to trick those investors into investing in SOIL SAVERS by purchasing stock and royalty interests therein from JOHNSON.

38.    As part of this continuing scheme to defraud, JOHNSON and BISHOP previously prepared a Memo to be distributed by SOIL SAVERS, INC. to potential investors (see Exhibit "A"). This is the same Memorandum sent to Parsons and Waters and referenced in detail in preceding paragraphs of this Complaint. As a result of continuing misrepresentations of JOHNSON and BISHOP from the Spring of 2003 to January of 2004, COVENANT II eventually was persuaded to invest One Million Dollars ($1,000,000) in SOIL SAVERS by purchase from JOHNSON of 500,000 shares of SSI, by virtue of a Subscription Agreement dated March 30, 2004, the same attached hereto and made a part hereof by reference as Exhibit "B".

VIII.

## **FIRST CLAIM**

### Federal Securities Violations Against Defendants JOHNSON, RIPPETOE, BISHOP and SOIL SAVERS. INC., a Texas corporation and DOES 1-7 (referred to collectively as "Defendants")

39.  Plaintiffs' First Claim against Defendants JOHNSON, RIPPETOE, BISHOP, and SOIL SAVERS, INC., a Texas corporation, and DOES 1-7 (referred to collectively as "Defendants") alleges:

40. Plaintiffs incorporate by reference Paragraphs 1-38 hereinabove as though the same were set forth in full herein.

41. By knowingly or recklessly misrepresenting the fraudulent nature of their investment program, and by otherwise making material misrepresentations, directly and indirectly, to Plaintiffs, Defendants directly and indirectly, by the use of the means and instrumentalities of interstate commerce, or of the mail, in connection with the purchase or sales of securities:

> a)  Have employed devices, schemes, or artifices to defraud;
>
> b)  Have made untrue statements of material fact, or have omitted, are omitting and are about to omit to state material facts necessary in order to make the statements made, in light of the circumstances with which they were made, not misleading; and
>
> c)  Have engaged in transactions, acts, practices and courses of business which operated as a fraud upon purchasers of securities.

42.  By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

43.  As a result of Defendants' violation of Section 10(b) of the Exchange Act, Plaintiffs have been damaged in the sum in excess of $2.56 Million Dollars.

IX.

## **SECOND CLAIM**

### **Breach of Contract Against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, INC., a Texas corporation and DOES 1-7 (referred to collectively as "Defendants")**

44.  Plaintiffs for a Second Claim against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, INC., a Texas corporation, and DOES 1-7 (referred to collectively as "Defendants") allege that:

45.  Plaintiffs incorporate by reference Paragraphs 1-43 hereinabove as though the same were set forth in full herein.

46.  Plaintiffs and Defendants entered into written Subscription Agreements and Investment Agreements as set forth hereinabove.

47.  Plaintiffs have fully performed all conditions, covenants and promises required of them, except those which have been prevented or excused by the actions and conduct of Defendants.

48.  Defendants breached the contract by misrepresenting, among many other things, the financial condition, assets, past projects, current projects and future projects of Soil Savers and its subsidiaries, thereby resulting in a failure of consideration. Defendants further breached the contracts by failing to pay royalties as required by the Investment Agreements. Defendants also breached the contracts by taking the money invested by Plaintiffs and causing the money to be paid to themselves individually or to their other corporations,

including RTJ Enterprises, Inc.

Additionally, these Defendants, by paying themselves excessive compensation, rates of pay and compensation approved only by themselves, for just themselves, breached their fiduciary duties as directors and officers. Furthermore, investors were told that their investments would be used by Soil Savers and its subsidiaries as working capital to grow those corporations, thereby creating increased market share and royalties for the investors.

49. Defendants further breached the contracts by licensing SOIL SAVERS' technology to ZOOM and creating a holding company, SSI HOLDINGS for the purpose of holding the allegedly proprietary technology and collecting licensing fees from ZOOM. Defendants further breached the investment contracts by abandoning SOIL SAVERS and its investors, and forming SOIL SAVERS-FL as a new corporation offering the same "patented technology' and services. The transactions were set up so that JOHNSON and others personally profited from the transaction, while investors/shareholders of SOIL SAVERS and its subsidiaries were deprived of SOIL SAVERS and its subsidiaries' assets, and the value that they held as a result of owning shares in SOIL SAVERS.

50. As a result of Defendants' breaches of the contracts, Plaintiffs have been damaged in the sum in excess of $2.56 Million Dollars.

X.

## THIRD CLAIM

### Recession Against Defendants JOHNSON, RIPPETOE, BISHOP. SOIL SAVERS, INC., a Texas corporation and DOES 1-7 (referred to collectively as "Defendants")

51. Plaintiffs for a Third Claim against Defendants

JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, INC., a Texas corporation, and DOES 1-7 (referred to collectively as "Defendants") allege that:

52. Plaintiffs incorporate by reference Paragraphs 1-50 hereinabove as though the same were set forth in full herein.

53. Plaintiffs entered into Subscription Agreements and Investment Agreements with Defendants, whereby Defendants represented that Plaintiffs would be purchasing shares of stock in companies that had ownership rights to certain patented technology. Defendants also represented that it had completed certain soil remediation projects and *was* contracted to perform extensive additional soil remediation projects currently and in the future. Defendants also provided Plaintiffs with copies of financial reports evidencing positive cash flow and cash in reserves substantiating Defendants' representations that SOIL SAVERS and its subsidiaries were growing on-going business concerns. Defendants also represented that there was substantial value of the various defendant corporations and stock ownership of those corporations was worth many millions of dollars.

54. The representation made by Defendants were in fact false. The true facts were that SOIL SAVERS did not own any patented technology, the financial statements were false, the valuation of the various corporate Defendants were false, seriously overvaluing the corporation; and, that past, present

and future jobs represented to be or to be handled by SOIL SAVERS and/or Rippetoe were not in fact performed by SOIL SAVERS and/or Rippetoe, but were not in fact performed or were performed by other entities; and, that the past, future, and current work alleged to be handled by SOIL SAVERS was exaggerated. The facts supporting this Claim are more specifically set forth in the foregoing paragraphs of this Complaint.

55. At the time the representations were made, and at the time Plaintiffs entered into the Subscription Agreements and Investment Agreements, Plaintiffs did not know the representations were false, but believed them to be true and reasonably relied upon them as set forth in this Complaint.

56. Plaintiffs will suffer substantial harm and injury under the Subscription Agreements and Investment Agreements if they are not rescinded because the considerations upon which the Subscription Agreements and Investment Agreements are based are illusory; and, thus there is accordingly a total failure of valid and lawful consideration.

57. Plaintiffs intend service of the Summons and Complaint in this action to serve as official notice of rescission of the Subscription Agreements and Investment Agreements, mentioned hereinabove; and, hereby demand that Defendants promptly restore to them all of their funds furnished in the subject transactions

by Plaintiffs, specifically TWO MILLION TWO-HUNDRED AND FIFTY-SIX THOUSAND DOLLARS ($2,256,000.00)

58. In performing the acts herein alleged, Defendants intentionally misrepresented and concealed from Plaintiffs material facts, well known to Defendants, as set forth in the foregoing paragraphs of this Complaint, with the intention on the part of Defendants of depriving Plaintiffs of their money, thereby properly justifying an award of punitive damages against Defendants.

XI.

## FOURTH CLAIM

### Fraud Against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS. INC., a Texas corporation and DOES 1-7 (referred to collectively as "Defendants")

59. Plaintiffs for a Fourth Claim against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, INC., a Texas corporation, and DOES 1-7 (referred to collectively as "Defendants") allege that:

60. Plaintiffs incorporate by reference Paragraphs 1-58 hereinabove as though the same were set forth in full herein.

61. Defendants knowingly made false representations to Plaintiffs with the intent to defraud these Plaintiffs. The representations made by Defendants, as set forth in the preceding paragraphs were representations regarding material

facts, which were relied upon by Plaintiffs in making their decision to invest in SOIL SAVERS, and the amount of money which would be invested. Plaintiffs reasonably relied on these actual representations as set forth in the preceding paragraphs of this Complaint.

62. As a proximate result of Defendants' fraud and deceit, and the facts hereinabove, Plaintiffs were collectively damaged in the sum in excess of $2.56 Million Dollars ($2,556,000.00).

63. In performing the acts herein alleged, Defendants intentionally misrepresented and concealed from Plaintiffs material facts, well known to Defendants, as set forth in the preceding paragraphs of this Complaint, with the intention on the part of the Defendants of depriving Plaintiffs of their money, thereby justifying an award of punitive damages against all of the Defendants.

XII.

## FIFTH CLAIM

### Negligent Misrepresentation Against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, INC., a Texas corporation and DOES 1-7 (referred to collectively as "Defendants")

64. Plaintiffs for a Fifth Claim against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, INC., a Texas corporation, and DOES 1-7 (referred to collectively as "Defendants") allege that:

65.  Plaintiffs incorporate by reference Paragraphs 1-63 hereinabove as though the same were set forth in full herein.

66.  Defendants made false representations to Plaintiffs without a reasonable belief or investigation into the accuracy of said representations, knowing that Plaintiffs would rely on those representations. The said representations made by Defendants, as set forth in the preceding paragraphs were representations regarding material facts, which were relied upon by Plaintiffs in making their decision to invest in SOIL SAVERS; and, the amount of money which would be invested via payment to Larry Johnson. Plaintiffs reasonably relied on these actual representations as set forth in the preceding paragraphs of this Complaint.

67.  Defendants, in making the representations set forth in the preceding paragraphs of this Complaint, did so without a reasonable belief in the accuracy and truthfulness of those statements. Plaintiffs reasonably relied upon those statements; and, as a result have been damaged in the sum in excess of $2.56 Million Dollars ($2,556,000.00).

XIII.

## SIXTH CLAIM

### Accounting Against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS INC., a Texas corporation and DOES 1-7 (referred to collectively as "Defendants")

68. Plaintiffs for a Sixth Claim against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, INC., a Texas corporation, and DOES 1-7 (referred to collectively as 'Defendants") allege that:

69. Plaintiffs incorporate by reference the preceding paragraphs hereinabove, as though the same were set forth in full herein.

70. As noted above, Plaintiffs and Defendants entered into various Subscription Agreements and Investment Agreements as described hereinabove.

Pursuant to the terms of these Agreements, specifically Section II of the Subscription Agreements, defendant SOIL SAVERS was to maintain full, accurate and complete books of accounts from records reflecting all activities and transactions under the Subscription Agreements. These books and records were to be open to Plaintiffs' reasonable inspection.

71. Defendants have alleged to have completed contracts for

the remediation of soil for various corporations alleged to be subsidiaries and affiliated and owned by Defendants herein, including SOIL SAVERS. In addition, it is believed by Plaintiffs that money was improperly diverted from SOIL SAVERS, and SSI HOLDINGS, to JOHNSON, RIPPETOE and BISHOP and their other corporations or entities. This money rightfully belongs to the shareholders of SOIL SAVERS, including Plaintiffs.

72. The amount of money due from Defendants to Plaintiffs as royalties is unknown to Plaintiffs and cannot be ascertained without an accounting of the contracts, receipts, disbursements and other accounting records of Defendants SOIL SAVERS; and also the records of all other "Soil Savers" entities, as well as RTJ Enterprises, Inc.

73. In addition, SOIL SAVERS entered into an agreement with ZOOM whereby SOIL SAVERS allegedly transferred the right to intellectual property regarding proprietary information for the remediation of soil and water. SSI Holdings, Inc., a Texas corporation, was formed as the holding corporation for this technology and to perform the obligations pursuant to the contract between SOIL SAVERS and ZOOM. Plaintiffs, as shareholders of SOIL SAVERS and as individuals entitled to royalties for soil treated utilizing the patented and proprietary information are entitled to royalties and other distributions resulting from this transaction, if any.

74. The amount of money due from Defendants to Plaintiffs regarding the ZOOM transaction cannot be ascertained without an accounting of the contracts, receipts, disbursements, and other accounting information of SOIL SAVERS and SSI HOLDINGS as well as other subsidiaries of SOIL SAVERS.

75. In addition, under the terms of various Subscription Agreements, Plaintiffs made payments to SOIL SAVERS for purchase of stock. Plaintiffs are informed and believe and thereon allege that JOHNSON, RIPPETOE and BISHOP caused SOIL SAVERS to issue large cash payments to them individually for money that was for the sale of SOIL SAVERS' stock.

These large sums of money which Plaintiffs allege and believe to have been paid to Johnson, Rippetoe and Bishop, was not reasonably related to any payment or compensation properly due to JOHNSON, RIPPETOE and/or BISHOP. These Defendants, acting despite the obvious conflicts of interest, merely provided amongst themselves approval of these excessive payments to each other. Plaintiffs, through their representatives and in some cases individually, demanded that Defendants account for the aforementioned transactions, and pay the amount found properly due to Plaintiffs, but the Defendants have wholly failed and refused and continue to fail and refuse to render the accounting and properly pay Plaintiffs.

XIV.

## SEVENTH CLAIM

**Conversion Against Defendants JOHNSON, BISHOP, RIPPETOE, SOIL SAVERS INC., a Texas corporation and DOES I-7 (referred to collectively as "Defendants"**

76.    Plaintiffs' Seventh Claim against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, INC., a Texas corporation, and DOES 1-7 (referred to collectively as "Defendants") allege that:

77.    Plaintiffs incorporate by reference Paragraphs 1-75 hereinabove as though the same were set forth in full herein.

78.    Under the terms of the Subscription Agreements and Investment Agreements, Plaintiffs were entitled to royalties based upon work performed by SOIL SAVERS and its subsidiaries, as more specifically set forth in each Subscription Agreement and each investment Agreement. Payment of royalties was due either on a monthly or quarterly basis.

79.    Defendants JOHNSON, RIPPETOE and BISHOP took money paid by customers to SOIL SAVERS and its subsidiaries for soil remediation, and instead of paying the money to Plaintiffs for royalties, as required by the Investment Agreements and Subscription Agreements, paid that money to themselves. Plaintiffs orally and in writing demanded the payment of royalties but Defendants have wholly failed, neglected and refused to pay royalties to Plaintiffs.

80.    As a result of Defendants' conversion of Plaintiffs' royalties and stock investments, Plaintiffs have been deprived of their property and have been denied the use of the royalty money, all to Plaintiffs' damage in a sum to be proven at trial.

81.    The aforementioned acts of Defendants were willful, wanton, malicious and oppressive and were taken with the intent to defraud and cheat the Plaintiffs, properly justifying the award of exemplary and punitive damages in this case.

XV.

## **EIGHTH CLAIM**

### **Plaintiffs Allege Violations of Texas Security Act Against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS. INC., a Texas corporation and DOES 1-7 (referred to collectively as "Defendants")**

82.    Plaintiffs for an Eighth Claim against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, INC, a Texas corporation, and DOES 1-7 (referred to collectively as "Defendants") allege that:

83.    Plaintiffs incorporate by reference paragraphs 1-81 hereinabove as though the same were set forth in full herein.

84.    By knowingly or recklessly misrepresenting the fraudulent nature of their investment program, and by otherwise making material misrepresentations, directly and indirectly, to Plaintiffs, the Defendants, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, or of

the    mail,    in    connection    with    the    purchase    or    sales    of

securities:

> a)    Have    employed    devices,    schemes,    or    artifices
> to defraud;

> b)    Have    made    untrue    statements    of    material
> fact,    or    have    omitted,    are    omitting    and    are    about    to
> omit    to    state    material    facts    necessary    in    order    to
> make    the    statements    made,    in    light    of    the
> circumstances    under    which    they    were    made,    not
> misleading; and

> c)    Have    engaged    in    transactions,    acts,
> practices    and    courses    of    business    which    operated    as    a
> fraud upon purchasers of securities.

85.    By    reason    of    the    foregoing,    the    Defendants    have
violated the Texas Securities Act.

86.    As    a    result    of    Defendants'    violation    of    the    Texas
Securities    Act,    Plaintiffs    have    been    damaged    in    the    sum    in
excess of $2.56 Million Dollars ($2,556,000.00).

XVI.

## NINTH CLAIM

### Injunctive Relief Against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, INC., a Texas corporation and DOES 1-7 (referred to collectively as "Defendants"

87.    Plaintiffs    for    an    Twelfth    Claim    against    Defendants

JOHNSON,    RIPPETOE,    BISHOP,    SOIL    SAVERS,    INC.,    a    Texas

corporation,    and    DOES    1-7    (referred    to    collectively    as

"Defendants")    allege that:

88.    Plaintiffs    incorporate    by    reference    Paragraphs    1-86

hereinabove as though the same were set forth in full herein.

89.    Beginning    on    or    perhaps    even    before    June,    2002;    and,

continuing to the present time, Defendants, and each of them, wrongfully and unlawfully transferred money invested by investors, including Plaintiffs, in SOIL SAVERS, FUEL FX and their affiliated companies for their own personal use. The money was invested by previous investors and also Plaintiffs for the purpose of capitalizing the corporation so Soil Savers would obtain profitable contracts and generate royalties to investors, and increase the value of Soil Savers.

90.    The money transferred by Defendants rightfully belongs to Plaintiffs as shareholders of SOIL SAVERS.

91. Plaintiffs request an injunction preventing Defendants, and each of them, from transferring, making payments or in any way taking possession of assets of SOIL SAVERS and SSI HOLDINGS without approval from this Honorable Court. Plaintiffs also respectfully request that all funds improperly transferred by Defendants be frozen, and that these assets promptly be paid to a Court appointed Receiver.

92. Plaintiffs have no adequate remedy at law for the damages and injuries they have already and are currently suffering, in that Defendants have essentially liquidated the subject corporations, and these funds form the only basis for Plaintiffs to recover the money invested in Defendants' fraudulent schemes.

93. Plaintiffs have incurred damages in excess of $2.56

Million Dollars, and will be further damaged as long as Defendants are allowed to maintain custody of these funds and take steps to further transfer and hide this money from creditors, and these Plaintiffs in particular.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray for judgment against Defendants, and each of them, for any and all relief requested hereinabove, plus such other relief as to which Plaintiffs are entitled at law or in equity, to include among other things, relief as follows, to-wit:

94. A preliminary injunction against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, from further violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b] thereunder.

95. A permanent injunction against Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, and any and all subsidiaries of SOIL SAVERS and their agents, servants, employees, and all persons in active contact or participation with them who receive actual notice of the injunction, by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

96. An order of this Honorable Court requiring a full, complete and accurate accounting; and also an interim asset freeze of any and all assets of the Defendants JOHNSON, RIPPETOE, BISHOP, SOIL SAVERS, and any and all subsidiaries of SOIL SAVERS, until a full, complete and accurate accounting can be made of all investor monies raised by virtue of the fraudulent schemes alleged in this Complaint; and, a judicial determination made as to the proper and lawful disposition of those assets.

97. On an interim basis that a Receiver be appointed to take possession and control of the assets of Defendants JOHNSON, RIPPETOE, BISHOP, and SOIL SAVERS; in order to properly marshal and control their assets, for the benefits of the defrauded Plaintiffs in this case.

98. An order that each Defendant be restrained and enjoined from destroying, removing, mutilating, altering, concealing or disposing of, in any manner, any of their books, records and documents relating to the matters set forth in the Complaint, or the books and records and such documents of any entities under their control, until further order of the Court; an order allowing that parties may commence discovery immediately, and that notice periods be shortened to permit the parties to require production of documents within ten (10) calendar days written notice by facsimile or personal service.

99.    An  order  requiring  Defendants  JOHNSON,  BISHOP,  SOIL SAVERS,  and  any  and  all  subsidiaries  of  SOIL  SAVERS  to repatriate  and  to  return  to  identified  accounts  in  the  United States of America all monies and liquid assets held outside this Court's jurisdiction.

100.    Disgorgement  of  all  illegal  and  illicit  profits  and benefits, plus pre-judgment interest, realized by each and every Defendant, all investor monies obtained by each Defendant, plus pre-judgment  interest  as  a  result  of  participation  in,  or attributable to, the various fraudulent schemes alleged in this Complaint.

101.    A  civil  monetary  penalty  against  each  Defendant  as provided by statute and as determined by this Honorable Court to be just and proper.

102.    For  rescission  of  the  Subscription  and  Investment Agreements between the Plaintiffs and Defendants, including an Order that Defendants promptly paid to and return to Plaintiffs any and all money invested by Plaintiffs, all as set forth in this Complaint.

103.    For judgment and award herein of monetary damages in excess of the sum of $2.56 Million Dollars ($2,556,000.00), plus punitive  damages,  attorney  fees  and  costs  as  allowed  by statute.

104.    That Plaintiffs have and receive judgment herein for

such other and further relief as Plaintiffs are entitled and as determined by this Honorable Court.

105. Plaintiffs Request a trial by jury on all claims recited herein.

Respectfully submitted,

LAW OFFICES OF KENNETH M. STILLMAN, P.C.


Kenneth M. Stillman
3514 Cedar Springs Road
Dallas, Texas     75219
VOICE:          214.522-0632
FACSIMILE:       214.526.0849
E-MAIL:          kstill@sbcglobal.net
Texas Bar No.    19240500

ATTORNEY FOR PLAINTIFFS

**Soil Savers, Inc.**

FOR YOUR RECORDS

# Memo

**To:**     Parties of Interest

**From:**   Larry Johnson

**CC:**

**Date:**   April 8, 2003

**Re:**     Limited stock of Soil Savers Inc

---

This overview is written for those familiar with Soil Savers, Inc. Currently, Soil Savers, Inc. is the holder of approximately 18 provisional patents that are currently being used by Soil Savers Inc. and or its affiliated companies. Soil Savers, Inc. owns the majority of the following companies.

1.  Fuel Fx Inc. -  Soil Savers currently owns 68% of the 25,000,000 Shares issued: Value Estimated **$25,000,000**

2.  Fuel Fx International Inc.- Soil Savers owns 70% of the 25,000,000 shares issued: Value Estimated: **$25,000,000+**

3.  Soil Savers of Florida Inc.  Soil Savers owns 100% of the 25,000,000 shares issued: current value **$5,000,000** ( This value will dramatically increase upon funding of the targeted fixed bases in the region)

4.  Soil Savers of New York Inc. Soil Savers Inc. owns 100% of the 25,000,000 shares issued: **$8,000,000** Value (This region is also slated for fixed bases which will also increase value)

5.  Fx Technologies Inc. ( Water technology): Soil Saver owns 100% Value estimated **$5,000,000**

Total Value of Stock: **$68,000,000** of companies owned or controlled:

Soil Savers has 25,000,000 shares authorized and issued:

18 provisional patents: IP Valued at **$50,000,000**

Value not currently carried on books: **$118,000,000**

Fuel FX Inc. (North American Market) is making slow, steady progress in the domestic market. We have recently engaged a marketing firm to enhance domestic sales. Meanwhile, the device continues performing well on demos and permanent installs. It will eventually be a tremendous product and profit center.

1

**EXHIBIT
A**

Fuel FX International Inc – We are experiencing rapid progress in numerous foreign countries. These foreign markets represent 80% of the world's diesel trucks. Our distributor (TUMAC SARL) in Tunisia has initially purchased and re-sold 1250 units as a direct result of our test results in Tunisia which averaged 40%. The Tunisian government witnessed and documented the results which were consequently published in national newspapers. There are efforts under way to have the government endorse our product. With such an endorsement customers would receive tax credits or subsidies for using the product. The Tunisian's have now embarked on marketing efforts into Morocco, Malta, Algeria, Egypt and Jordan. We expect continued increased sales from this region. Norway, Sweden and Spain are currently testing. We are currently negotiating with a distributor for the U.K. Brazil tests for FX have averaged 40%. China is currently preparing their first purchase order and has committed to a $1.8 M FFX sales license fee. A recent FX reactor demonstration for 20+ Asian clients in San Diego averaged well over 25%. This was also documented by a film crew. These events are a critical link to penetrating these large markets.

Fx Technologies Inc - (SSI's Water Treatment Technology) has been awarded a contract to clean up Lake Reseda outside of Los Angeles. This is of particular concern due to the fact we have been sole sourced on the project. This project will utilize the FX Tri-Cyclonic separator. It will also become a show piece for additional projects.

Soil Savers of Florida Inc - SSIF has begun the process of establishing fixed based operating facilities in the state of Florida. We expect to complete by FYE 2003. (Fiscal year end is Dec 31st)

Soil Savers of New York – SSNY currently has about 12 million dollars in projects for the next 12 to 18 months. (1,300,000 tons) A fixed base is also targeted for this market 2003-04

Soil Savers Inc. expects to clean 2 Million tons domestically during the next 14-18 months

Soil Savers Inc. has licensed various technologies to these following companies for use internationally. Soil Savers, Inc. recently licensed Soil Savers Technology to a substantial company in Norway. The technology was licensed for a $400,000 up front fee and a technology transfer fee of $5.00 per ton. China also has offered $1.5M for a SSI license with a $5.00 per ton technology transfer fee.

Initial projects include the Oslo Airport (1,000,000 tons), an additional hydrocarbon site 50 miles southwest of Oslo consisting of 300,000 tons and a development which requires remediating creosote contaminates left from a railroad system (180,000-200,000 tons) . Soil Savers, Inc. recently entered into an alliance with one of the largest construction companies in Kuwait and a large engineering company in the U.S. to pursue the clean-up of the 1991 oil field fires in Kuwait. This project is expected to grow in size and will commence after stability returns to the region after the current war. Initial estimates of the clean up in Kuwait are in the $30-36 billion dollar range. This clean up will treat 36 million tons. (One third of the problem area previously was inaccessible because it was located in Iraq and was not factored into the total clean-up estimates) Soil Savers, Inc. was chosen by the United Nations to complete a feasibility study prior to the start of the war. Soil Savers has opted for a direct alliance with this construction firm in Kuwait which has proven to be more beneficial than working with the U.N. Soil Savers has recently received signed exclusive agreements with these firms which have access to large parts of this pending clean-up. No other technology in the world has the advantages or abilities to recover oil from under ground oil lakes and remediate the remaining soil with the speed, efficiency and price point we offer.

Soil Savers Inc. is currently negotiating with some large New York Institutional funding sources who have expressed a deep desire to facilitate the capitalization of fixed soil remediation bases for SSIF and SSNY as well as other states nationwide. In addition these individuals have strong government contacts which will be accessed for additional market share utilizing the patented Soil Savers process. These alliances have access to extremely large capital sources which will enable Soil Savers to gain substantial market share and national recognition. It is the desire of these firms to capitalize and grow the parent and its affiliates over the next few years in order to build value for a consolidation and potential public offering. It will also be their desire to control or have first right to acquire any future stock offerings, making this offer likely the last time any SSI parent company stock will be available.

**There is a very limited window of opportunity to purchase up to 10% or 2,500,000 shares of this parent company stock (SSI) for $1.60 per share.** This stock at this price is undervalued and will be available for a very short period of time only. **This 10% or 2.5 M share offering will be tied to a $1.50 cent per ton soil remediation royalty worldwide** ~~which will terminate when the stockholder has received two times their stock investment in~~ SSI. We felt that our current investors might have the desire to acquire this stock which is tied to everything SSI is involved in. We appreciate your past support and look forward to the future growth of our company and this exciting technology. If anyone should have an interest please indicate to the appropriate parties. The necessary investment and subscription agreements are attached. Any questions to corporate regarding this private sale need to be addressed directly to Larry Johnson at (469)-374-9040 ext.212.

Larry Johnson

SEE COVENANT CAPITAL PARTNERS

President C.E.O Soil Savers Inc.

• Page 3

12/18/03

COV I

# Investment Agreement
# Soil Savers, Inc.

**AGREEMENT,** made in Dallas, Texas on the date set forth below and by and between Soil Savers, Inc., a Texas corporation ("SSI") having its principal office presently located at Suite 630 LB 13, 5720 LBJ Freeway, Dallas, Texas 75240 and Larry T. Johnson, the founder and CEO of SSI ("LJ") and Covenant Capital Partners, a Tennessee general partnership ("Investor") in regards to the assignment to Investor of royalties due to Larry Johnson from SSI.  SSI, LJ and Investor are collectively referred to herein as the "Parties").

## WITNESSETH:

**WHEREAS,** the Parties have previously entered into and agreed upon a certain Subscription Agreement which is attached hereto and made a part hereof by reference.  This Investment Agreement is **separate,** subsequent and supplemental to the aforementioned Subscription Agreement.

**WHEREAS,** in issuing those securities to the undersigned Investor which are the subject of the aforementioned Subscription Agreement, the Parties further agreed as set forth herein.

**NOW, THEREFORE,** considering the premises and in consideration of the mutual promises of the Parties contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows, to-wit:

### SECTION I – TERMS OF INVESTMENT

LJ hereby assigns to Investor the Royalty Rights, as defined herein.  SSI acknowledges the assignment and agrees to pay directly to Investor a $.7775 Cents U.S. per ton royalty on soil treated by (SSI) worldwide (the "Royalty Rights").  Each fiscal quarter the Investor will receive an accounting and payment for the tonnage treated and payments received by SSI. This royalty will continue in effect for the life of the Company and patents. In addition, the Investor will receive 972,500 shares of Soil Savers, Inc. common stock for an investment of $1,556,000.00 pursuant to the Subscription Agreement.

**EXHIBIT**

tabbies'

**B**

_____

Initials

## SECTION II - REPORTS, PAYMENTS, ACCOUNTING AND INSPECTIONS

2.1  <u>Accounting</u>.  With respect to each quarter, within fifteen (15) days after the end of each quarter, SSI shall submit the following to Investor, as applicable:

(a)  A copy of all reports concerning treatment of any soil utilizing the technology.

(b)  A calculation of the Royalties due Investor under the terms of this Agreement.

2.2  <u>Books and Records</u>.  SSI shall maintain at its principal place of business full, accurate and complete books of accounts and records reflecting all activities and transactions under this Agreement. SSI shall keep such books and records in at least sufficient detail as will permit confirmation of the data to which Investor is entitled, including the data necessary to calculate Investor's royalties.  These books and records shall be open to Investor's inspection and audit during usual business hours, from time to time, upon reasonable advance notice by Investor or Investor's designated representatives, who shall be entitled to copy the books and records, but the same shall remain strictly confidential.  Investor's right to inspect shall include any of SSI's records reflecting information either provided to or maintained for any regulatory agencies or authorities or industry associations pertaining to SSI's operations under this Agreement.  Such books and records shall be maintained for no less than three (3) years after the period to which they pertain. SSI shall cause its appropriate employees and agents to reasonably cooperate with the Investor in connection with such inspections or audits.  Any such inspection or audit shall be at Investor's sole cost and expense (except as otherwise provided in this Agreement).

2.3  <u>Independent Audit</u>.  In the event that Investor requests an independent audit of SSI's books and records pursuant to this Agreement, all audit expenses shall be borne by Investor. With respect to any individual payment by SSI to Investor of more than $50,000 and with respect to the aggregate of all payments by SSI to Investor with respect to each separate payment, should such audit reveal a ten percent (10%) or greater deficiency in any such individual payment or with respect to any such aggregate payments, then SSI shall bear the entire cost of such audit.

Initials

2.4    <u>Confidentiality of Business Information</u>.  The Parties hereby undertake, and for their respective officers, employees, and agents covenant to maintain in confidence all Job Books and Records concerning the business of the Parties under this Agreement.  SSI's books and records shall remain confidential and shall not, at any time (during or after the Term of this Agreement), be disclosed or revealed by Investor to any person or entity, except as may be required by any governmental regulatory body or by the rules or regulations of such body, or to be used in any manner except in furtherance of this Agreement.

2.5    <u>Disclosure of this Agreement</u>.  In the event that any Party (or any officer, employee or agent of such Party) is requested pursuant to, or required by, applicable law, regulation or legal process to disclose this Agreement, any provision of the Agreement, or any item that would be considered Confidential Information, such Party, officer, employee or agent will notify the other Party promptly so that such other Party may seek a protective order or other appropriate remedy or, in its sole discretion, waive compliance with the terms of this Agreement.  In the event that no such protective order or other remedy is obtained, or that the other Party waives compliance with the terms of this Agreement, each Party required to make such disclosure will furnish only that portion of the Confidential Information which it is advised by counsel is legally required and will exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the arty may disclose the terms of this Agreement to any person or entity without the prior approval by the other Party of the substance of the proposed disclosure, provided that such approval shall not be unreasonably withheld.

2.6    <u>Payment</u>.  Royalties with respect to each quarter shall be paid by SSI to Investor on a quarterly basis on the 10th day of the month following the end of the quarter. Each such payment shall be accompanied by the reports referred to in Section 2.1.

2.7    <u>No Waiver</u>.  The rendering of any report and/or the payment of royalty, or receipt and acceptance of any royalty shown to be due shall not, in any event, bar, or, in any way, operate as an estoppel of Investor's rights of examination, inspection and audit, as provided for herein, nor any rights or remedies of Investor's to any additional royalties that may be found to be due, all of which rights and remedies, it is mutually understood and agreed by the Parties, shall survive and shall not be deemed to have been waived by any act or omission on the part of Investor.

Initials

## SECTION III – MISCELLANEOUS PROVISIONS

3.1    Binding Effect.    The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

3.2    Notice.    All notices, requests, elections, demands, consents, and other communications hereunder shall be in writing and shall be (i) delivered by hand, (ii) sent by telecopy (answerback received) or (iii) sent by overnight mail or courier, in each case to the following addresses:

(a)    If to SSI, addressed to it as follows, or to such other address as may be furnished to Investor in writing by SSI:

> Soil Savers, Inc.
> Suite 630 LB 13
> 5720 LBJ Freeway
> Dallas, Texas  75240
> Telecopy:  (469) 374-9042

(b)    If to Covenant Capital Partners, addressed to it as follows, or to such other address as may be furnished.

> **Covenant Capital Partners**
> **620 Copper Ridge Trail**
> **Antioch, Tennessee  37013**
> **Attn: Richard Waters**
>
> With a copy to:
>
> **Miller & Martin LLP**
> **150 4th Ave North Suite 1200**
> **Nashville, TN 37219**
> **Attn: Melvin Malone**
> **Fax: (615-256-8197)**

All notices shall be effective upon being personally delivered, or upon confirmation of a facsimile or upon delivery to a reputable express messenger service for next day delivery.  The period in which a response to any such notice must be given shall commence to run from the date of receipt or rejection of delivery of a personally delivered notice, on the date of confirmation of a telephonic facsimile, or on the second day following the delivery to a reputable express messenger service for next day delivery.  Addresses may be changed upon notice of such change given as provided in this Section 3.2.

3.3    Waiver.    No waiver of any provision of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

Initials

3.4    Invalidity. Notwithstanding anything to the contrary in this Agreement, all provisions of this Agreement are hereby limited to the extent mandated by any applicable law or decisions, and shall only apply to and be effective in those parts of the Territory where such provisions are legal and enforceable.  If any provision or portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable, and such determination shall become final, to that extent and within the jurisdiction in which it is invalid, illegal or unenforceable, such provision or portion shall be deemed to be severed and deleted from this Agreement, and the remaining provisions and portions shall survive and continue to be enforced so as to give effect to the intentions of the Parties insofar as that is possible.

3.5    Applicable Law.   This Agreement shall be governed by and shall be construed in accordance with the laws of the State of Texas without regard to the conflict of law rules thereof.

3.6    Entire Agreement. This Agreement constitutes the entire agreement between the Parties pertaining to its subject matter, and it supersedes all prior contemporaneous agreements, representation, and understandings of the Parties.   No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all Parties.

3.7    Counterparts.   The Parties AGREE this Agreement may be executed in counterpart and by fax transmissions, each counterpart and fax transmission being deemed an original.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first written above.

Dated: 7/29/03

SOIL SAVERS, INC.

Attest: _____    By: _____
          Secretary                  Larry Johnson    CEO

                                 _____
                                 Larry Johnson, Individually


COVENANT CAPITAL PARTNERS

By: _____
    Richard Waters Co-Managing Partner

By: _____
    Michael Parsons Co-Managing Partner

                                        Initials



# Soil Savers, Inc.

INCORPORATED UNDER THE LAWS OF THE STATE OF TEXAS

**TOTAL AUTHORIZED ISSUE**
25,000,000 SHARES PAR VALUE $.001 EACH

COMMON STOCK

THE SECURITIES REPRESENTED BY THE CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR STATE SECURITIES LAWS, BUT HAVE BEEN ISSUED OR TRANSFERRED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT. NO DISTRIBUTION, SALE, OFFER FOR SALE, TRANSFER, DELIVERY, PLEDGE, OR OTHER DISPOSITION OF THESE SECURITIES MAY BE EFFECTED EXCEPT IN COMPLIANCE WITH THE ACT, ANY APPLICABLE STATE LAWS, AND THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION AND STATE AGENCIES PROMULGATED THEREUNDER.

See Reverse for Certain Definitions

975,000

**This is to Certify that**  Covenant Capital Partners

**is the owner of**

Nine hundred seventy five thousand ***********************************

fully paid and non-assessable shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

Witness, the seal of the Corporation and the signatures of its duly authorized officers.

Dated July 29, 2003

Robert W. Clark, Jr.       SECRETARY

Larry A. Johnson       PRESIDENT

© 1999 CORPEX BANKNOTE CO., BAY SHORE N.Y.

JS 44 (Rev 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

COVENANT CAPITAL PARTNERS AND
COVENANT CAPITAL PARTNERS II

**DEFENDANTS**

SOIL SAVERS, INC., LARRY T. JOHNSON, WILLIAM (BILL) W.
RIPPETOE, & ROBERT G. BISHOP

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____GRAYSON_____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE.  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorney's (If Known)

**3-06 CV-0399 N**

*RECEIVED MAR 3 2006 CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF TEXAS*

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U S  Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)            and One Box for Defendant

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl Ret Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**).

Brief description of cause: Violations of the Securities Statutes (Both Federal and State) and Fraud and Misrepresentation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 2,556,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____  DOCKET NUMBER _____

DATE
3/3/2006

SIGNATURE OF ATTORNEY OF RECORD
*Kenneth M. Stillman*

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____